RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA ex rel. MARJORIE
PRATHER,

*Relator-Appellant*,

No. 17-5826

*v.*

BROOKDALE SENIOR LIVING COMMUNITIES, INC. et al.,
*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cv-00764—Aleta Arthur Trauger, District Judge.

Argued: April 25, 2018

Decided and Filed: June 11, 2018

Before: MOORE, McKEAGUE, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Patrick Barrett, BARRETT LAW OFFICE, PLLC, Nashville, Tennessee, for
Appellant. Brian D. Roark, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellees.
Megan Barbero, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Amicus Curiae. **ON BRIEF:** Patrick Barrett, BARRETT LAW OFFICE, PLLC, Nashville,
Tennessee, Michael Hamilton, PROVOST UMPHREY LAW FIRM, LLP, Nashville, Tennessee,
for Appellant. Brian D. Roark, J. Taylor Chenery, Angela L. Bergman, BASS, BERRY & SIMS
PLC, Nashville, Tennessee, for Appellees. Megan Barbero, Charles W. Scarborough, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

MOORE, J., delivered the opinion of the court in which DONALD, J., joined.
McKEAGUE, J. (pp. 22–43), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Brookdale Senior Living Communities employed Marjorie Prather to review Medicare claims prior to their submission for payment. Many of these claims were missing the required certifications from physicians attesting to the need for the medical services that the defendants had provided.  These certifications need to "be obtained at the time the plan of care is established or as soon thereafter as possible."  42 C.F.R. § 424.22(a)(2).  But the defendants were allegedly obtaining certifications months after patients' plans of care were established.

In July 2012, Prather filed a complaint pleading violations of the False Claims Act under an implied false certification theory.  The district court dismissed her complaint, holding that Prather did not allege fraud with particularity or that the claims were false.  This panel reversed the district court in part, holding that Prather had pleaded two of her claims with the required particularity and that the claims submitted were false.  *United States ex rel. Prather v. Brookdale Senior Living Cmties., Inc. (Prather I)*, 838 F.3d 750, 775 (6th Cir. 2016).  In doing so, we interpreted the phrase "as soon thereafter as possible" in 42 C.F.R. § 424.22(a)(2) to mean that a delay in certification is "acceptable only if the length of the delay is justified by the reasons the home-health agency provides for it" and held that the reason alleged for the defendants' delay was not justifiable.  *Id.* at 765.

On remand, the district court granted Prather leave to file her Third Amended Complaint ("complaint") in light of the Supreme Court's clarification of the materiality element of a False Claims Act claim in *Universal Health Services., Inc. v. United States ex rel. Escobar*, ___ U.S. ___, 136 S. Ct. 1989 (2016).  The defendants moved to dismiss again on the grounds that Prather did not plead sufficiently the materiality and scienter elements of her two alleged False Claims Act violations.  The district court granted that motion, and Prather now appeals.  For the reasons set forth below, we **REVERSE** the district court's dismissal of Prather's complaint and **REMAND** for proceedings consistent with this opinion.

# I.  BACKGROUND

## A.  Legal Background

The False Claims Act, 31 U.S.C. § 3729 *et seq.*, imposes civil liability that is "essentially punitive in nature" on those who defraud the U.S. government.  *Escobar*, 136 S. Ct. at 1996 (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000)).  Here, Prather is asserting a theory of liability under the False Claims Act known as "implied false certification."  Under this theory, "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's non-compliance with a statutory, regulatory, or contractual requirement."  *Id.* at 1995.  This misrepresentation through omission "renders the claim 'false or fraudulent' under § 3729(a)(1)(A)."  *Id.*  "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Id.* at 1996.

The claims and alleged misrepresentations at issue in this case arise in the context of Medicare and home-health services.  Medicare Parts A and B provide coverage for certain home-health services.  *Prather I*, 838 F.3d at 755 (citing 42 U.S.C. §§ 1395c and 1395k(a)(2)(A)).  These services include: "skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy services, and medical social services."  *Id.* (internal quotation marks and brackets denoting alterations omitted).  "'Medicare Part A or Part B pays for home health services only if a physician certifies and recertifies' the patient's eligibility for and entitlement to those services."  *Id.* (quoting 42 C.F.R. § 424.22).

These certifications are projections about the patient's medical need and plan of care, and Medicare payments for the care provided are made on a prospective system of 60-day periods, known as an "episode of care."  *Id.* at 756.  Payments for each episode are made in two parts.  The initial payment—the "request for anticipated payment" or "RAP"—is a percentage of the total expected reimbursement.  *Id.* (citing 42 C.F.R. § 484.205(b)).  The second payment—the "residual final payment"—is disbursed at the end of the episode.  *Id.* (citing 42 C.F.R. § 484.205(b)).

"The certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan." 42 C.F.R. § 424.22(a)(2). This regulation "permits a home-health agency to complete a physician certification of need after the plan of care is established, but . . . such a delay [is] acceptable only if the length of the delay is justified by the reasons the home-health agency provides for it." *Prather I*, 838 F.3d at 765.[1] If the required certification was not obtained in compliance with the timing requirement in 42 C.F.R. § 424.22(a)(2), the RAP and final payment claims are "impliedly false." *Id.* at 766–67.

## B. Factual Background

Prather, the relator in this case, "was employed by Brookdale Senior Living, Inc. as a Utilization Review Nurse from September of 2011 until November 23, 2012."[2] R. 98 (Third. Am. Compl. ¶ 10) (Page ID #1462). Defendant Brookdale Senior Living, Inc., along with defendants Brookdale Senior Living Communities, Inc., Brookdale Living Communities, Inc., Innovative Senior Care Home Health of Nashville, LLC, and ARC Therapy Services, LLC, "are

---

[1]The dissent attempts to re-litigate the issues decided in *Prather I*, including efforts to muddy the holding of that decision. Dissent Op. at 22, 30–31, 39–40. Both 42 C.F.R. § 424.22(a)(2) and our corresponding interpretation are not hard to understand. Certifications are timely in two situations. First, they are timely if they were "obtained at the time the plan of care is established." 42 C.F.R. § 424.22(a)(2). This is a binary rule: either the certification was obtained at the time the plan of care was established or it was not. Second, certifications are timely if they were signed as soon as possible after the plan of care is established. *Id.* This is a standard. Although the dissent is unhappy that it is a standard and not a rule, Dissent Op. at 30, this was how the regulation was written and neither we, the parties, nor the U.S. government can pretend this away. *Prather I*, 838 F.3d at 765 n.6. The strength, and weakness, of standards is that they are fact-specific in their application. Thus, whether a certification complies with the standard that it be signed "as soon thereafter as possible," 42 C.F.R. § 424.22(a)(2), depends on the reason it was not completed at the time the plan of care was established. Imagine if the certification is signed one day after the plan of care is established. The reason? The certifying physician had to leave work early the day before because of a family emergency, and therefore delayed signing the certification. In this hypothetical, the length of the delay—one day—is plausibly justified by the reason for the delay—a personal emergency. Now imagine another certification that is signed months after the plan of care was established. In this case, the reason is because the home-healthcare provider is incompetent with its paperwork. This appears to be a situation in which the delay of several months is not justified by the excuse. This is a commonsense approach to which we continue to adhere.

[2]These facts are drawn from Prather's complaint and attached exhibits. R. 98 (Third. Am. Compl.) (Page ID #1459–96). Because of the case's procedural posture—it is before us on an appeal from the district court's grant of a motion to dismiss—we presume all factual allegations in the complaint to be true. Furthermore, as this court and the parties are familiar with the basic factual allegations in this case, we recite only those alleged facts that are relevant to the issues currently being litigated before us.

interconnected corporate siblings who operate senior communities, assisted living facilities, and home health care providers." *Id.* ¶ 3 (Page ID #1460).

Prather alleges that it was the defendants' policy to "enroll[] as many of their assisted living facility residents as possible in home health care services that were billed to Medicare," *id.*, even when these treatments "were not always medically necessary or did not need to be performed by nurses who billed to Medicare." *Prather I*, 383 F.3d at 765; R. 98 (Third. Am. Compl. ¶¶ 70, 105, 110) (Page ID #1477, 1486, 1488). This "aggressive solicitation of their senior community and assisted living facility residents ultimately generated thousands of Medicare claims that were 'held' because they did not meet basic Medicare requirements . . . ." R. 98 (Third Am. Compl. ¶ 3) (Page ID #1460). "In September of 2011, there was a large backlog of about 7,000 unbilled Medicare claims worth approximately $35 million." *Id.* ¶ 77 (Page ID #1478). To facilitate the processing of these claims, the defendants initiated the "Held Claims Project," and Prather was hired to work on this specific assignment. *Id.* ¶ 77–80 (Page ID #1478–49).

> Prather's job responsibilities included:
>
> (1) pre-billing chart reviews in order to ensure compliance with the requirements and established policies of Defendants, as well as state, federal, and insurance guidelines; (2) working directly with the Regional Directors, Directors of Professional Services, and clinical associates to resolve documentation, coverage, and compliance issues; (3) acting as resource person to the agencies for coverage and compliance issues, (4) reviewing visits utilization for appropriateness pursuant to care guidelines and patient condition; and (5) keeping Directors of Professional Services apprised of problem areas requiring intervention.

*Id.* ¶ 80 (Page ID #1479).

The Held Claims Project team "used a 'billing release checklist' to identify items that needed to be completed before [a] claim could be released for final billing to Medicare." *Id.* ¶ 82 (Page ID #1480). The checklist and corresponding documents for each claim were then given to the billing office. *Id.* Once the billing office had all the documentation required, it submitted the bill to Medicare. *Id.*

One of the required documents frequently missing was the physician certification. Initially, Prather and the other project members "sent attestation forms to doctors for them to sign to correct the problem of missing signatures," but they "only received a few signed and completed forms back from the doctors." *Id.* ¶ 86 (Page ID #1481). Beginning in May 2012, to facilitate the process of gathering the required certifications, "Defendants paid physicians to review outstanding held claims and sign orders for previously provided care." *Id.* ¶ 98 (Page ID #1483). Additionally, team members visited physicians in order to obtain certifications. *Id.* ¶ 104 (Page ID #1818–19). Prather also alleges that the defendants repeatedly "billed RAPs without having physician certifications, and then re-billed them immediately after the RAPs were canceled in order to keep the funds received through the RAPs, while still lacking the required physician certifications." *Id.* ¶ 99 (Page ID #1484).

Prather alleges that she, and the other employees in the Held Claims Project, "raised concerns" about "compliance problems" with supervisors. *Id.* ¶ 91–92 (Page ID #24). But the defendants told the utilization review nurses to ignore problems they found and only cursorily to review the documentation. *Id.* ¶ 23, 91, 94–95 (Page ID #1481–83). In response to Prather's repeated comments to her supervisors that she was discovering compliance issues, she was told that the defendants could "just argue in our favor if we get audited." *Id.* ¶ 114 (Page ID #1489).

To support her allegations that the defendants failed to comply with the timing requirement in 42 C.F.R. § 424.22(a)(2), Prather included five examples in her complaint and incorporated by reference two exhibits containing spreadsheets listing information about hundreds of other untimely certifications. In the examples in her complaint, Prather describes physician certifications obtained from a few months to nearly a year after an episode of care began. *Id.* ¶ 104–13 (Page ID #1485–89). In her attached Exhibit A, Prather identifies 489 claims submitted to Medicare for which she alleges "Defendants did not obtain the required physician certification of need until after the episode was complete and/or the patient was discharged." *Id.* ¶ 115–17 (Page ID #1489–90); R. 98-1 (Third Am. Compl. Ex. A) (Page ID #1497–1520). Similarly, in Exhibit B, Prather identifies 771 claims that were allegedly submitted to Medicare with physician certifications of the required face-to-face encounter that were not obtained "until after the patient had been discharged and/or the episode was complete."

R. 98 (Third Am. Compl. ¶ 118–20) (Page ID #1491); R. 98-2 (Third Am. Compl. Ex. B) (Page ID #1521–54).

## C.  Procedural History

Prather filed her complaint in this lawsuit under seal in July 2012 asserting multiple False Claim Act violations and state-law claims.  R. 1 (Sealed Compl. at 28–45) (Page ID #28–45).  In April 2014, the United States declined to intervene, and Prather's complaint was unsealed and served on the defendants.  R. 23 (Notice of Election to Decline Intervention) (Page ID #103–04); R. 24 (Apr. 10, 2014 Dist. Ct. Order) (Page ID #107–08).  Before the defendants had responded to the initial complaint, Prather filed her First Amended Complaint.  R. 52 (First Am. Compl.) (Page ID #178–211).  The defendants subsequently moved to dismiss for failure to comply with Federal Rule of Civil Procedure 9(b), R. 56 (First Mot. to Dismiss at 1) (Page ID #217), and the district court granted the motion without prejudice, R. 71 (Mar. 31, 2015 Dist. Ct. Op.) (Page ID #889–922).

In June 2015, Prather filed her Second Amended Complaint.  R. 73 (Second Am. Compl.) (Page ID #924–57).  She alleged three claims:  (1) the presentation of false claims to the United States government in violation of 31 U.S.C. § 3729(a)(1)(A); (2) the making or use of material false records or statements in the submission of claims to the government in violation of 31 U.S.C. § 3729(a)(1)(B); and (3) the wrongful retention of overpayments in violation of 31 U.S.C. § 3729(a)(1)(G).  *Id.* at 29–32 (Page ID #952–55).  The defendants again moved to dismiss for failure to comply with Federal Rule of Civil Procedure 9(b).  R. 78 (Second Mot. to Dismiss at 1) (Page ID #1028).  The district court granted the motion with respect to all three counts.  R. 89 (Nov. 5, 2015 Dist. Ct. Op.) (Page ID #1358–1402).

Prather appealed, and this panel reversed the district court's "dismissal of Prather's claims regarding the submission of false or fraudulent claims for payment and the fraudulent retention of payments," but affirmed the "dismissal of Prather's claim regarding the use of false records."  *Prather I*, 838 F.3d at 775.  The briefs in *Prather I* were filed prior to the Supreme Court's decision in *Escobar*, so we did not address any potential impact that decision may have had on Prather's complaint.  *Id.* at 761 n.2.  On remand to the district court:

the defendants stated their intent to file a motion to dismiss the Second Amended Complaint for failure to meet the standards set forth in *Escobar*. Because the Second Amended Complaint was filed before *Escobar* was issued, the court afforded the relator an opportunity to amend her complaint again, specifically to attempt to satisfy the pleading obligations identified in that case.

*United States ex rel. Prather v. Brookdale Senior Living Cmties., Inc.*, 265 F. Supp. 3d 782, 787 (M.D. Tenn. 2017).

Prather filed her Third Amended Complaint in March 2017. R. 98 (Third. Am. Compl.) (Page ID #1459–96). She asserted two claims: (1) the presentation of false claims to the United States government in violation of 31 U.S.C. § 3729(a)(1)(A); and (2) the wrongful retention of overpayments in violation of 31 U.S.C. § 3729(a)(1)(G). *Id.* ¶ 121–31 (Page ID #1492–94). The defendants moved again to dismiss the complaint. R. 102 (Third Mot. to Dismiss) (Page ID #1571–73). The defendants argued that Prather had failed to plead adequately the required elements of materiality and scienter under *Escobar*. *Id.* at 1 (Page ID #1571). The district court granted the defendants' motion to dismiss with prejudice, holding that Prather had not sufficiently pleaded materiality. *Prather*, 265 F. Supp. 3d at 801; R. 113 (June 22, 2017 Dist. Ct. Order) (Page ID #2142); R. 114 (Dist. Ct. J.) (Page ID #2143). It did not reach the issue of scienter. *Prather*, 265 F. Supp. 3d at 801.

Prather's timely appeal from the district court's judgment is now before the same panel that heard her original appeal in *Prather I*.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pleaded with particularity applies to complaints alleging violations of the False Claims Act, because "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." *Prather I*, 838 F.3d at 760 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)). "To satisfy Rule 9(b), a complaint of fraud, 'at a minimum, must allege the time, place, and content of the alleged misrepresentation on which [the plaintiff] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d

439, 444 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe I)*, 342 F.3d 634, 643 (6th Cir. 2003)).  If the complaint "alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide[] examples of specific' fraudulent conduct that are 'representative samples' of the scheme."  *Id.* at 444–45 (alteration in original) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys. (Bledsoe II)*, 501 F.3d 493, 510 (6th Cir. 2007)).

"This Court reviews *de novo* a district court's dismissal of a complaint for failure to state a claim, including dismissal for failure to plead with particularity under [Rule] 9(b).'"  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017) (alteration in original) (quoting *United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, 642 F. App'x 547, 550 (6th Cir. 2016)), *cert. denied*, No. 17-1399, 2018 WL 1697046 (U.S. May 29, 2018).  We "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Bledsoe II*, 501 F.3d at 502 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.  ANALYSIS

To plead a claim under the False Claims Act, the plaintiff must sufficiently allege that: (1) the defendant made a false statement or created a false record; (2) with scienter; (3) that was "material to the Government's decision to make the payment sought in the defendant's claim"; and (4) that the defendant submitted to the U.S. government causing it to pay the claim.  *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (quoting *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 (6th Cir. 2010)); *see also United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017), *petition for cert. filed*, 86 U.S.L.W. 3361 (U.S. Dec. 26, 2017) (No. 17-936).  In *Prather I*, we resolved in Prather's favor the issue of whether Prather had sufficiently pleaded facts supporting the first element.  838 F.3d at 762.  The parties are now contesting whether Prather sufficiently pleaded the second and third elements:  scienter and materiality.  Appellant Br. at 12; Appellees Br. at 14–15.  These two elements are integral to both of Prather's alleged claims and therefore Count One and Count Two of Prather's complaint rise or fall together.  *Prather*, 265 F. Supp. 3d

at 801.  Because the district court addressed only materiality and not scienter, we will discuss the two elements in that order.

## A. Materiality

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Escobar*, 136 S. Ct. at 2002.  The Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  In *Escobar*, the Supreme Court clarified this materiality requirement and emphasized that the "standard is demanding."  136 S. Ct. at 2003.

"[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'"  *Escobar*, 136 S. Ct. at 2002 (second alteration in original) (quoting 26 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 69:12 (4th ed. 2003)).  Something is material if a reasonable person "would attach importance to [it] in determining his choice of action in the transaction" or "if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not."  *Id.* at 2002–03 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 538 (AM. LAW INST. 1977)).

The analysis of materiality is "holistic."  *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016).  Relevant factors include:  (1) "the Government's decision to expressly identify a provision as a condition of payment"; (2) whether "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" or if, with actual knowledge of the non-compliance, it consistently pays such claims and there is no indication that its practice will change; and (3) whether the "noncompliance is minor or insubstantial" or if it goes "to the very essence of the bargain."  *Escobar*, 136 S. Ct. at 2003 & n.5.  None of these considerations is dispositive alone, nor is the list exclusive.  *Id.* at 2001–04.

### 1. Express Condition of Payment

"A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 136 S. Ct. at 2003. But such a designation is a relevant factor in determining materiality. *Id.*

The parties vigorously dispute whether the timing requirement in 42 C.F.R. § 424.22(a)(2) is an express condition of payment for RAPs and residual final payments.[3] Appellant Br. at 25–27; Appellees Br. at 28–35; Appellant Reply Br. at 4–6. The district court concluded that the timing requirement was an express condition of payment for both, *Prather*, 265 F. Supp. 3d at 796, and we agree.

Medicare Parts A and B condition payment for services on a physician's certification regarding the necessity of such services. 42 U.S.C. §§ 1395f(a)(2) & 1395n(a)(2); 42 C.F.R. § 424.10. Thus, "[i]n order for home health services to qualify for payment under the Medicare program," 42 C.F.R. § 409.41 mandates that "[t]he physician certification and recertification requirements for home health services described in [42 C.F.R.] § 424.22" be met. 42 C.F.R. § 409.41(b). The timing requirement at issue in this case is located in 42 C.F.R. § 424.22.

Prather argues that this analysis answers the question. Section 409.41(b) expressly conditions payment on meeting the certification requirements in § 424.22. Section 424.22(a)(2) contains the timing requirement for the certification Prather alleges the defendants violated. Thus, Prather argues, § 424.22(a)(2) must be an express condition of payment. Appellant Br. at 26.

Not so fast argue the defendants. Section 409.41(b) directs the reader to the requirements "described in § 424.22." So the reader must then look to the language in § 424.22 itself. Appellees Br. at 30. Section 424.22 states: "Medicare Part A or Part B pays for home health services only if a physician certifies and recertifies the content specified in paragraphs (a)(1) and

---

[3]The relevant "provision[s] . . . do[] not distinguish between requests for final payment and requests for anticipated payment" in stating the conditions of payment, *Prather I*, 838 F.3d at 766 (citing 42 C.F.R. § 424.10(a)), and thus we will not do so here either.

(b)(2) of this section, as appropriate." The defendants argue that this language limits the broader language of 42 C.F.R. § 409.41 by making only the requirements in 42 C.F.R. § 424.22(a)(1) and (b)(2) express conditions of payment. Appellees Br. at 29.

The defendants are correct that § 409.41(b) incorporates the requirements in § 424.22, and thus it is necessary to examine the latter section to understand the scope of the former. For example, if § 424.22 contained a provision that stated "certifications may be submitted via U.S. mail" then § 409.41(b) could not be read as to make it an express condition of payment that the certification must be submitted via U.S. mail merely by reference to § 424.22 as a whole. But the defendants' reading of the introductory clause in § 424.22 is overly crabbed.

The prefatory language states that payment requires the physician to certify (or recertify) the contents specified in § 424.22(a)(1) and (b)(2). Section 424.22(a), entitled "[c]ertification," then explains in further detail what a certification requires. Thus, § 424.22(a) gives meaning to the word "certifies" in the introductory clause. The required certification is not a certification unless it complies with all provisions of § 424.22(a), both (a)(1) and (a)(2). And § 424.22(a)(2) states that the certification "*must* be obtained at the time the plan of care is established or as soon thereafter as possible and *must* be signed and dated by the physician who establishes the plan."[4] *Cf. Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 1000–01 (9th Cir. 2010) (holding that 42. C.F.R. § 424.22(d), which limits which physicians may certify or recertify the need for home-health services, is an express condition of payment), *cert. denied*, 562 U.S. 1102 (2010).

Consequently, we agree with the district court that the timing requirement in 42 C.F.R. § 424.22(a)(2) is an express condition of payment. Thus, this factor weighs in favor of the

---

[4]The opposite conclusion would produce results that are antithetical to common sense. Under the defendants' approach, it is not an express condition of payment that the certification be signed and dated by the physician who establishes the plan of care. But an unsigned and undated document stating that the patient is eligible for a home-health benefit is not a certification. *See Certification*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("1. The act of attesting; esp., the process of giving someone or something an official document stating that a specified standard has been satisfied."); *Attest*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("1. To bear witness; testify . . . . 2. To affirm to be true or genuine; to authenticate by signing as a witness.").

conclusion that a misrepresentation with respect to this requirement is material.[5]   *Escobar*, 136 S. Ct. at 2003.

### 2. Past Government Action[6]

Another relevant factor in determining materiality is the government's past response to claims violating the same requirement.  As the Supreme Court explained:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on non-compliance with the particular statutory, regulatory, or contractual requirement.  Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.  Or if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Escobar*, 136 S. Ct. at 2003–04.

Prather made no allegations regarding the government's past practice with respect to claims that the government knew did not comply with 42 C.F.R. § 424.22(a)(2).  Rather, she only alleged facts regarding the government's reactions to claims submitted by the defendants: "The United States, unaware of the falsity of the claims that Defendants submitted, and in reliance on the accuracy thereof, paid Defendants and other health care providers for claims that would otherwise not have been allowed."  R. 98 (Third. Am. Compl. ¶ 125) (Page ID #1493).

---

[5]The dissent seeks to reduce the weight of this factor by discussing the mechanisms by which a home healthcare provider would disclose violations of 42 C.F.R. § 424.22(a)(2).  Dissent Op. at 32–37.  In doing so, it loses sight of the woods for the trees.  The implied false certification theory of liability is premised on the notion that parties submitting claims to the government must not "fail[] to disclose noncompliance with material statutory, regulatory, or contractual requirements."  *Escobar*, 136 S. Ct. at 2001.  Thus, a provider who has committed a material violation cannot submit a claim in silence—regardless of whether its claim form has a box for reporting violations.  An inquiry, therefore, into how mechanically providers could report violations is not helpful in determining materiality.

[6]The United States filed an amicus brief and appeared at oral argument taking a position only on this "past-government-action prong" of the materiality analysis.  Amicus Br. at 4.  It argued that the district court erred in its evaluation of this factor.  *Id.*  The United States appeared, as it is authorized to do so, to speak only on this issue.  28 U.S.C. § 517; FED. R. APP. P. 29.  The dissent's implied criticism of the United States' counsel taking only a limited position in this case is not well-founded.  Dissent Op. at 26, 32.  The legislative branch has created the scheme that gives the executive branch the ability to "attend to the interests of the United States," 28 U.S.C. § 517, as it—not we— may choose.

Without allegations regarding past government action taken in response to known non-compliance with 42 C.F.R. § 424.22(a)(2), this factor provides no support for the conclusion that the timing requirement is material.

In its analysis, the district court went one step further and drew a negative inference from the absence of any allegations about past government action. It held that Prather's "inability to point to a single instance where Medicare denied payment based on violation of § 424.22(a)(2), or to a single other case considering this precise issue, weighs strongly in favor of a conclusion that the timing requirement is not material." *Prather*, 265 F. Supp. 3d at 797. This is one step too far.

Although a relator in a *qui tam* action faces a demanding standard at the motion-to-dismiss stage with respect to pleading materiality, she is not required to make allegations regarding past government action. The Supreme Court was explicit that none of the factors it enumerated were dispositive. *Escobar*, 136 S. Ct. at 2003. Thus, it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive. *Escobar*, 842 F.3d at 112 ("We see no reason to require Relators at the Motion to Dismiss phase to learn, and then to allege, the government's payment practices for claims unrelated to services rendered to the deceased family member in order to establish the government's views on the materiality of the violation. Indeed, given applicable federal and state privacy regulations in the healthcare industry, it is highly questionable whether Relators could have even accessed such information."); *see also Campie*, 862 F.3d at 907 (holding that although discovery may reveal "that the government regularly pays this particular type of claim in full despite actual knowledge that certain requirements were violated, such evidence is not before us" and the relator had sufficiently alleged facts supporting that the requirement at issue was material).

Furthermore, we "must construe the complaint in the light most favorable to the plaintiff." *Bledsoe II*, 501 F.3d at 502. Inferring from the absence of allegations regarding past government action, as the district court did, that this means the timing requirement is not material is an inference adverse to the relator and in favor of the defendant. This improperly inverses the pleading standard.

Prather alleges that the government did not know that the claims the defendants submitted were false.  R. 98 (Third. Am. Compl. ¶ 125) (Page ID #1493).  Without actual knowledge of the alleged non-compliance, the government's response to the claims submitted by the defendants—or claims of the same type also in violation of 42 C.F.R. § 424.22(a)(2)—has no bearing on the materiality analysis.

### 3.  Essence of the Bargain

Another factor relevant to materiality is whether the "non-compliance is minor or insubstantial" or if it goes "to the very essence of the bargain."  *Escobar*, 136 S. Ct. at 2003 & n.5.  The defendants concede that the physician certification does go to the essence of the bargain between themselves and the government—and therefore is material—but argue that the timing of the certification does not.  Appellees Br. at 35.  In response, Prather makes two arguments for why the timing requirement goes to the essence of the bargain.  She first argues that the timing requirement is necessary to prevent fraud.  Appellant Br. at 32–34; Appellant Reply Br. at 6–10.  Prather next contends that the federal government's guidance as to the importance of the certification's timeliness demonstrates materiality.  Appellant Br. at 35–37; Appellant Reply Br. at 10–14.

In *Prather I*, we discussed the timing requirement's connection to fraud prevention when interpreting the phrase "as soon thereafter as possible" in 42 C.F.R. § 424.22(a)(2).  838 F.3d at 764.  We noted that the timing requirement

> makes it more difficult to defraud Medicare.  Absent a deadline, a home-health agency might be able to provide unnecessary treatment absent a doctor's supervision and take the time to find doctors who are willing to validate that care retroactively.  A deadline allowing only a short—and justified—delay between the beginning of care and the completion of the physician certification could make such a scheme difficult to pull off.

*Id.* at 764.[7]  Whether the party on the other side of a transaction complied with the regulations aimed at preventing unnecessary or fraudulent certifications is a fact that a reasonable person

---

[7]Prather does not allege that the dates on the certifications were fraudulently backdated.  Thus, a government agent reviewing each claim could determine that the physician certifications were not obtained in accordance with 42 C.F.R. § 424.22(a)(2) by looking at the underlying documentation and comparing the dates of the episode of care with the date on the physician certification.  But merely because the government had an alternate

would want to know before entering into that transaction.[8] *Escobar*, 136 S. Ct. at 2002–03; *cf. United States v. Luce*, 873 F.3d 999, 1007–08 (7th Cir. 2017) (holding material a misrepresentation that none of the officers of a loan-originating company were currently subject to criminal proceedings on a certification that "addressed a foundational part of the Government's mortgage insurance regime, which was designed to avoid the systemic risk posed by unscrupulous loan originators").

In her complaint, Prather referred to numerous guidance documents issued by the Department of Health and Human Services that she argues shows that the timing requirement goes to the essence of the bargain between the defendants and the government. R. 98 (Third Am. Compl. ¶ 47–52) (Page ID #1471–73); Appellant Br. at 35–36. Although this guidance was over ten years old at the time of the alleged false claims, it does provide some support for Prather's assertion that the timing requirement is material. Prather references three publications issued by the Office of Inspector General for the Department of Health and Human Services which emphasize the timing requirement for physician certifications and highlight 'untimely and/or forged physician certifications on plans of care" as an "area[] of special concern."  OIG Compliance Program Guidance for Home Health Agencies, 63 Fed. Reg. 42,410, 42,414 (Aug. 7, 1998); OIG Special Fraud Alert on Physician Liability for Certifications in the Provision of Medical Equipment and Supplies and Home Health Services, 64 Fed. Reg. 1813, 1814 (Jan. 12, 1999); OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-02-00-00620, THE PHYSICIAN'S ROLE IN MEDICARE HOME HEALTH 2–4 (2001).  Prather also cites 2015 guidance from the Centers for Medicare and Medicaid Services, which states:  "It is not acceptable for HHAs to wait until the end of a 60-day episode of care to obtain a completed

---

way to assess the timeliness of the certifications does not negate the materiality of the defendants' alleged misrepresentation about their compliance with § 424.22(a)(2). *See* 31 U.S.C. § 3729(b)(4) (defining material as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"); *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494, 505 (8th Cir. 2016) ("To the extent Heritage asserts that its statements, even if false, did not cause any actual harm, this is not an element of materiality.").

[8]The dissent suggests that concern about fraud is illusory in this context.  Dissent Op. at 38.  But in her complaint, Prather points to evidence that "untimely and/or forged physician certifications on plans of care" are a key focus for the Inspector General for the Department of Health and Human Services. R. 98 (Third. Am. Comp. ¶ 47) (citing OIG Compliance Program Guidance for Home Health Agencies, 63 Fed. Reg. 42,410, 42,414 (Aug. 7, 1998)); *see also infra*.  Reasonable people want to know if a party has complied with regulations addressing an area of historical concern. *Escobar*, 136 S. Ct. at 2002–03.

certification/recertification." R. 86-2 (Medicare Benefit Policy Manual (2015) § 30.5.1—Physician Certification at 32) (Page ID #1270). This specific manual was not in effect at the time of the defendants' alleged conduct, but it provides some support for Prather's allegation that the government has consistently emphasized the importance of the timing requirement and its longstanding policy has been to mandate that home-healthcare providers complete the physician certification prior to the end of the episode of care.[9] R. 98 (Third Am. Compl. ¶ 51) (Page ID #1473).

The defendants argue that the government's decision not to intervene in this case indicates that the timing requirement is not material. Appellees Br. at 37–38. This argument is unpersuasive. In *Escobar* itself, the government chose not to intervene, and the Supreme Court did not mention this as a relevant factor in its materiality analysis. 136 S. Ct. at 1998. On remand, the First Circuit held that the relators had sufficiently pleaded materiality, without reference to the government's declination of intervention. *Escobar*, 842 F.3d at 112. Furthermore, the False Claims Act is designed to allow relators to proceed with a *qui tam* action even after the United States has declined to intervene. 31 U.S.C. § 3730(d)(2). If relators' ability to plead sufficiently the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the Act. *See* Trevor W. Morrison, *Private Attorneys General and the First Amendment*, 103 MICH. L. REV. 589, 600–01 (2005) (describing how the False Claims Act is structured such that it encourages private citizens to pursue enforcement actions on behalf of the government).

---

[9]The dissent claims that this manual's relevance is undercut by our decision in *Prather I*. Dissent Op. at 38–39. But the dissent is conflating this case with *Prather I* and the two ways Prather has utilized this evidence. In *Prather I*, Prather pointed to the manual to support her argument that certifications could never be timely if signed after the end of the episode of care. We rejected this argument as contrary to the plain language of the regulation. *Prather I*, 838 F.3d at 765 n.6. In the case currently before us, Prather points to this manual as evidence that the government has consistently emphasized the importance of the timing requirement, thus making it more likely that the requirement is material to the government's decision to pay these kinds of claims. This second inference is the one that is relevant to this case, and it supports the conclusion that Prather has pleaded sufficiently the materiality element.

* * *

After considering the factors implicated in this case that *Escobar* identified as indicative of materiality, we conclude that Prather has sufficiently alleged the required materiality element. The timing requirement in 42 C.F.R. § 424.22(a)(2) is an express condition of payment. Furthermore, Prather alleges that the government paid the claims submitted by the defendants without knowledge of the non-compliance, thus making the government's payment of the claims irrelevant to the question of materiality. Lastly, § 424.22(a)(2) is a mechanism of fraud prevention, which the government has consistently emphasized in its guidance regarding physician certifications.

## B. Scienter

The defendants also argue that Prather failed to plead sufficiently the element of scienter. Appellees Br. at 41. The district court did not reach this issue in its decision. *Prather*, 265 F. Supp. 3d at 801.

"False Claims Act liability for failing to disclose violations of legal requirements" will not attach unless "the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996. The Act "defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Id.* (quoting 31 U.S.C. § 3729(b)(1)(A)). "Knowing" and "knowingly" does not require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). And, at the motion-to-dismiss stage, a plaintiff need only allege the scienter element generally. FED. R. CIV. P. 9(b).

"[A]n aggravated form of gross negligence (i.e. reckless disregard) will satisfy the scienter requirement for an FCA violation." *United States ex rel. Wall v. Circle C Constr., L.L.C.*, 697 F.3d 345, 356 (6th Cir. 2012) (alteration in original) (quoting *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008)). Congress added the "reckless disregard" prong to the definition of knowledge in the False Claims Act "to target that defendant who has 'buried his head in the sand' and failed to make some inquiry into the claim's validity."

*United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012) (quoting S. Rep. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286). This inquiry must be "reasonable and prudent under the circumstances." *Id.* (quoting S. Rep. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5286).

In her complaint, Prather alleges sufficient facts that support the reasonable inference that the defendants acted with "reckless disregard" with respect to their compliance with 42 C.F.R. § 424.22(a)(2). First, Prather alleges that she and the other nurses employed to review claims were instructed to review the claims only cursorily. R. 98 (Third Am. Compl. ¶ 87) (Page ID #1481). Those working for the Held Claims Project were told that they needed to release claims more quickly. *Id.* ¶ 88 (Page ID #1481–82). To that end, Prather and her co-workers were instructed not to review the content of much of the documentation. *Id.* ¶ 94–95 (Page ID #1483).

Second, Prather alleges that both she and the other nurses raised concerns about the defendants' compliance with Medicare regulations, but were told to ignore any problems. *Id.* at ¶ 91–92 (Page ID #1482). Prather states that her concerns were repeatedly dismissed and she was told that "there is such a push to get the claims through." *Id.* ¶ 92, 96 (Page ID #1482, 1483). Additionally, Prather was told on multiple occasions that "[w]e can just argue in our favor if we get audited" as a solution to any compliance issues. *Id.* ¶ 114 (Page ID #1489).

Lastly, Prather alleges facts demonstrating that the defendants knew that their practices with respect to claims were potentially in violation of governing regulations. The defendants sent an email acknowledging that not all physicians would be "comfortable" with signing untimely certifications and that the defendants could not "force" them to sign. *Id.* ¶ 98 (Page ID #1484). Drawing all inferences in favor of Prather, as we must, this email suggests that the defendants knew that their conduct was, at least, perilously close to noncompliance such that doctors might refuse to be complicit in the defendants' billing practices.[10] Furthermore, Prather alleges that a supervisor in the billing office alerted the employees that the defendants' practice

---

[10]Contrary to the dissent's suggestion, Dissent Op. at 41–42, awareness that coercing physicians to sign certifications would be a separate unlawful act does not negate this scienter.

of cancelling and re-submitting RAPs because of a lack of physician certifications might prompt an audit from Medicare. *Id.* ¶ 100 (Page ID #1484–85).

All these factual allegations support the inference that the defendants were on notice that their claim-submission process was resulting in potential compliance problems. Once the defendants had been informed by the employees explicitly hired to review these claims that there may be compliance issues, they had an obligation to inquire into whether they were actually in compliance with all appropriate regulations, including 42 C.F.R. § 424.22(a)(2). According to Prather, however, the defendants did not conduct such an inquiry and instead repeatedly pushed their employees to ignore problems, which they knew might trigger an audit, in a rush to get the claims submitted. In doing so, the defendants acted with "reckless disregard" as to the truth of their certification of compliance and to whether these requirements were material to the government's decision to pay.[11]

These factual allegations suffice, at the motion-to-dismiss stage, to demonstrate scienter. Discovery may reveal that the defendants did conduct an inquiry into their compliance with 42 C.F.R. § 424.22(a)(2) that was "reasonable and prudent under the circumstances." *Williams*, 696 F.3d at 530 (quoting S. Rep. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5286). But, at this stage in the litigation, Prather has alleged sufficient facts supporting the inference that the defendants deliberately ignored multiple employees' concerns about their compliance with relevant regulations, and instead pressured their employees only cursorily to review claims for compliance problems so that they could be quickly submitted for reimbursement.

---

[11]The dissent constructs a strawman and complains that we are saying that Prather alleges that the defendants violated a requirement that did not exist at the time of the conduct at issue. Dissent Op. at 41. This misreads our opinion. As the defendants themselves note, Appellee Br. at 24, the timing requirement in 42 C.F.R. § 424.22(a)(2) is longstanding and was in effect during the alleged wrongdoing. Thus, when the defendants were put on notice that they may be violating regulations, including 42 C.F.R. § 424.22(a)(2), they had an obligation to investigate. It is this alleged failure to make a reasonable inquiry that supports Prather's allegations of scienter, *Wall*, 697 F.3d at 356, and not—as the dissent states—the defendants' ability to anticipate the development of the law in this area.

## IV.  CONCLUSION

Prather has sufficiently pleaded that the defendants misrepresented their compliance with the material timing requirement in 42 C.F.R. § 424.22(a)(2), and that they acted with "reckless disregard" as to whether they had complied with this requirement and whether this requirement was material.  For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for proceedings consistent with this opinion.

---------------------

**DISSENT**

---------------------

DAVID W. McKEAGUE, Circuit Judge, dissenting.  For the second time, this panel has reversed a well-reasoned decision by the district court to dismiss Prather's complaint.  *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 775 (6th Cir. 2016) (*Prather I*) (McKeague, J., concurring and dissenting).  Two years ago, the majority invented a more stringent timing-and-explanation requirement out of whole cloth and grafted it onto the Medicare regulations.  Today, the majority decides both that this requirement (created by the court in 2016) was somehow material to the government's decision to pay claims in 2011 and 2012, and that the defendants knew, seven years ago, that it was material—even though Prather identifies no authority in support of that position.  Since Prather's complaint does not satisfy Rule 8 or Rule 9(b), I respectfully dissent from the majority's opinion.

**I**

This case involves home-health services billed to Medicare by the defendants (collectively, "Brookdale").  *Id.* at 755.  Brookdale is a Home-Health Agency ("HHA") that coordinates the provision of care and the billing of those services to Medicare.

**A**

Medicare covers the cost of certain home-health services for patients who are confined to the home and need in-house medical care.  42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 424.22.  Before Medicare will pay for these services, a physician must (among other things) certify that the patient is eligible for the home-health benefit, must establish a plan of care, and must complete a face-to-face encounter with the patient.  42 C.F.R. § 424.22(a).  The signatures on these certifications "must be obtained at the time the plan of care is established or as soon thereafter as possible."  *Id.* § 424(a)(2); *Prather I*, 838 F.3d at 762–63.

Billing for home-health services occurs in sixty-day cycles.  In other words, Medicare pays the HHA a fixed amount, designed to reimburse it for all costs associated with sixty days of

covered services. *Prather I*, 838 F.3d at 756. The sixty-day period is known as the "episode of care." Reimbursement under this prospective payment system is done in two steps. First, the HHA submits a Request for Anticipated Payment ("RAP"), which prompts Medicare to transmit a percentage of the total payment to the HHA. *Id.* Once care is completed, the provider submits a final bill to Medicare. Medicare then settles the account and submits the balance of the payment. *Id.* Medicare itself is not directly involved in these transactions—the agency contracts with Medicare Administrative Coordinators ("MACs"), companies who handle the process on Medicare's behalf. For the purposes of this case, a false statement to a MAC is a false statement to Medicare.

A HHA can submit a RAP even if the certifications have not been signed. *See* Medicare Claims Processing Manual, Ch. 10, § 10.1.10.3 (stating that a RAP may be billed once "the OASIS assessment is complete," "verbal orders for home care have been received and documented," "[a] plan of care has been established and sent to the physician," and "[t]he first service visit under that plan has been delivered"). Thus, while the provider must have the plan of care in place to bill a RAP, it need not have all the signatures squared away before billing the RAP. *See id.* However, the same guidance prohibits HHAs from submitting a final bill "until after all services are provided for the episode and the physician has signed the plan of care and any subsequent verbal order." *Id.* § 10.1.10.4. The signed certifications must be kept on file with the provider and must be produced if the MAC or Medicare requests them. 42 C.F.R. § 424.22(c).

In *Prather I*, the court held that late signatures, if unexplained, could be "impliedly false" under the False Claims Act ("FCA"). 31 U.S.C. § 3729(a)(1)(A); *Prather I*, 838 F.3d at 765–66. Specifically, the court held that "delay [is] acceptable only if the length of the delay is justified by the reasons the home-health agency provides for it." *Prather I*, 838 F.3d at 765. If those reasons are inadequate, then the claim is false, and a relator or the United States can recover damages under the FCA. *Id.* at 765–66. Between the briefing and the decision in *Prather I*, however, the Supreme Court held that implied-false-certification claims that rely on a misleading omission are only actionable if the omission is material. *Universal Health Servs., Inc. v. United*

*States ex rel. Escobar*, 136 S. Ct. 1989, 1999–2001 (2016).  We declined to address materiality in *Prather I*, opting to leave that issue for the parties on remand.  *Prather I*, 838 F.3d at 761 n.2.

**B**

After Prather amended her complaint on remand to better comply with *Escobar*, Brookdale moved to dismiss.  The district judge granted the motion, reasoning that Prather failed to plead materiality.  Prather appeals that order.

I will not belabor the facts, which are addressed in detail elsewhere.  However, it is important to understand what Prather has *not* claimed.  Her complaint does not allege that Brookdale backdated the certifications so that they only appeared to be signed in a timely manner (which would be fraud).  She does not allege that the certifications were not signed before final bills were submitted to Brookdale's MAC (which would also be fraud).  Neither does she allege that Brookdale withheld information from the MAC or from Medicare, nor does it appear any request was ever issued (if that were true, this would be a fraudulent-concealment case, rather than a fraud-by-omission case).  *Compare* Restatement (Second) of Torts § 550 (Liability for Fraudulent Concealment) *with* § 551 (Liability for Nondisclosure).  Finally, it does not appear that the certification forms were part of the billing package sent to the MAC.  Stated differently, the mechanics of the billing process would not inherently disclose to the MAC that the certification signatures were late.[1]

---

[1]This is an important concern raised by the United States as an *amicus* in this case.  If the MAC reviewed the physician certifications alongside the bills, then it would be nearly impossible for Prather to show materiality.  If the government was able to compare the date of the signature on the certification to the episode of care on the bill itself, then it had all the information it needed to deny the claim as not properly payable due to a late signature.  *See Escobar*, 136 S. Ct. at 2003–04.  If the government paid those hypothetical claims anyway, Prather would struggle to show materiality.  *See id.*  However, since the government had no reason to know about the potential defect in the signatures, I agree with the United States that Medicare's decision to pay in this context cannot be held against them (in a FCA prosecution) or against a relator (in a declined FCA case).

Instead, Prather alleges that the defendants submitted over 1,000 claims where the certifications or other crucial documents were not signed until long after the episode of care had ended.  She offers up four patients as exemplars:

|  | Episode | RAP | F2F encounter signed | Certification signed | Final bill |
|---|---|---|---|---|---|
| **Patient A** | 12/14/11 – 2/11/12 | 12/14/11 | 2/24/12 (+14 days)* | 6/29/12 (+4.5 months) | 7/10/12 |
| **Patient B** | 9/9/11 – 11/7/11 | 9/9/11 | 6/4/12 (+7 months) | 7/10/12 (+8 months) | 7/12/12 |
| **Patient C** | 7/25/11 – 9/22/11 | 7/25/11 | 12/11/11 (+2.5 months) | 12/11/11 (+2.5 months) | 7/5/12 |
| **Patient D** | 1/10/12 – 3/9/12 | 1/10/12 | 6/12/12 (+3 months) | 6/12/12 (+3 months) | 6/22/12 |

*Dates in parentheses are dates from the last day of the episode of care.  To calculate from the beginning of the episode, add two months to the time listed.*

Prather alleges that these delays would be material to the MAC's payment decisions, and therefore that Brookdale committed fraud by failing to disclose them and explain the delay.

To state a claim for fraud, Prather must make two related showings in her complaint. First, she must plead, with particularity, that these omissions were material to the government. Second, she must allege facts plausibly suggesting that Brookdale acted with fraudulent intent. In my opinion, her complaint accomplishes neither of these things.

## II

I address the materiality issue first.  To survive a motion to dismiss, the plaintiff must show that the *Prather I* requirement was material to the government's decision to pay Brookdale's claims.  In other words, even if the length of the delay was unacceptable or if the explanation for such delay was insufficient, Prather must show that these errors were significant enough to influence the government's actual payment decisions, not merely its abstract legal rights.

## A

Fraud is typically premised on affirmative misrepresentations. This is because a party to a business transaction ordinarily has no duty to disclose facts to his adversary. *See* Restatement (Second) of Torts § 551(1). However, in *Escobar* the Court clarified that the False Claims Act imposes, at least, a duty to avoid certain misleading omissions in claims for monetary reimbursement from the government. *Escobar*, 136 S. Ct. at 1999–2000. Because this kind of "silent fraud" is an exception to the rule, the Court limited its application to cases where a person "state[s] the truth so far as it goes" but knows the statement to be "materially misleading because of his failure to state additional or qualifying matter." *Escobar*, 136 S. Ct. at 1999–2000 (quoting Restatement, § 529). Under this rule, a "half-truth may be as misleading as a statement wholly false" and is equally tortious. Restatement, § 529; *Escobar*, 136 S. Ct. at 2000.

The Court was also painfully clear that not all regulatory violations are material. The government frequently requires contractors to "aver their compliance" with all relevant regulations, and the Court was unwilling to embrace the "extraordinarily expansive" liability that would exist if "failing to mention noncompliance with any of those requirements" would be fraudulent. *Escobar*, 136 S. Ct. at 2004. This statement was not mere dicta—it was in direct response to the United States' argument that every undisclosed regulatory violation would trigger FCA liability. *See id.*

Instead, the fundamental question here is whether the government agents on the ground would have acted differently if they knew of the omitted fact. Stated differently, Prather must show that the government justifiably relied on the nondisclosure, assuming that if something had been out of place, Brookdale would have said so. *See* Restatement (Second) of Torts §§ 537–38 (observing that materiality is inextricably rooted in the concept of justifiable reliance); 31 U.S.C. § 3729(b)(4) (stating that a fact is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"). Although this broad standard is clear, applying it to the particulars of this case has proven difficult for everyone involved. When pressed at oral argument, Prather was unable to provide an answer to this question, and the United States was unwilling to do so. In my mind, the majority opinion is

equally unenlightening on this issue. Before explaining why Prather has failed to plead materiality, then, I attempt to put more flesh on the skeleton provided by *Escobar*.

**B**

All agree that Prather bears the burden of showing that these omissions were material. *Escobar*, 136 S. Ct. at 2004. But exactly how is she supposed to accomplish that, in this context? It's a fair question, and it has not been answered by us or any of the other Circuits. Since I would affirm the dismissal of her complaint, it is only fair that I explain, in detail, why she has fallen short of the goal.

**1**

Whenever a plaintiff alleges fraud, he or she must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The Sixth Circuit has never asked whether the materiality of an omission is one of those circumstances and, if so, what it means to plead the material nature of an omission with particularity. I would hold that the particularity requirement applies here, and that it requires Prather to explain how and why these omissions deceived the government.

Rule 9(b) imposes the particularity requirement for several reasons. Requiring the plaintiff to plead the "circumstances constituting fraud" provides notice, alerting the defendants "as to the particulars of their alleged misconduct" so that they can respond. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007). It also "protect[s] defendants against spurious charges of immoral and fraudulent behavior," *Prather I*, 838 F.3d at 771 (internal citations and quotation marks omitted), and discourages "fishing expeditions," *Bledsoe*, 501 F.3d at 503 n.11. We have stated that the particulars of fraud include, "at a minimum . . . the time, place, and content of the alleged misrepresentation on which [the plaintiff] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 444 (6th Cir. 2008) (internal citations and quotation marks omitted).

The Court has strongly suggested that materiality should be added to this list. In *Escobar*, the Court recognized that "the common law could not have conceived of fraud without proof of materiality." *Escobar*, 136 S. Ct. at 2002 (quoting *Neder v. United States*, 527 U.S. 1, 22 (1999)). Indeed, the purpose of the *Escobar* opinion was to emphasize that materiality is essential to a successful silent-fraud claim; it is the lodestar by which the courts separate the careless from the nefarious. Add to this the Court's decision to characterize the materiality standard as "demanding," a label that fits more comfortably with the "special pleading" framework of Rule 9 than the notice-pleading regime established by Rule 8.

Furthermore, every Circuit to address this question agrees that Rule 9(b) governs materiality allegations. *See Minzer v. Keegan*, 218 F.3d 144, 151 (2d Cir. 2000); *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017) ("Materiality must be pleaded with particularity under Rule 9(b).") (interpreting the False Claims Act); *In re Donald J. Trump Casino Securities Litig.*, 7 F.3d 357, 374–75 (3d Cir. 1993); *Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010); *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 798–80 (8th Cir. 2011); *Hemmer Grp. v. SouthWest Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013); *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1329–30 (11th Cir. 2009); *Sampson v. Wash. Mut. Bank*, 453 F. App'x 863, 866 (11th Cir. 2011).

In *Prather I*, we relaxed the Rule 9(b) standard slightly. We did so because Prather was close enough to the billing department to say with near certainty that the claims were submitted to the government. *Prather I*, 838 F.3d at 769–73. But Prather has no similar proximity to the government's payment decisions, and so she cannot avail herself of the relaxed standard in this context. Thus, she must overcome the full force of the particularity requirement if her complaint is to survive.

**2**

What does it mean to plead a material omission with particularity? Although our precedent is sparse on the issue, other Circuits have offered a near-uniform test for answering this question. Put simply, a plaintiff must explain *why* the omissions were material to the government and *how* the government was misled by those omissions. *See Vigil*, 639 F.3d at

798–800 ("[T]he Complaint fails to allege with particularity . . . why these alleged regulatory violations were material to the government's decision to pay. . . ."); *Hopper*, 588 F.3d at 1330 (holding a complaint deficient when it "d[id] not link the alleged false statements to the government's decision to pay false claims."); *Hemmer Grp.*, 527 F. App'x at 626 ("A plaintiff must 'show with particularity how the [accounting irregularities] affected the company's financial statements and whether they were material in light of the company's overall financial position.'" (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1018 (9th Cir. 2005)); *Sampson*, 453 F. App'x at 866 ("[A] plaintiff must state with particularity . . . the content and manner in which the[] statements misled the Plaintiffs.") (internal quotation marks omitted).

The Eighth Circuit provides a particularly enlightening analysis of this issue. In *Vigil*, the court addressed a False Claims Act complaint alleging that a student-loan contractor was using false certifications to defraud the U.S. Department of Education of interest subsidies. Although the plaintiff set out, in detail, how the certifications were false, the panel held that this was not enough to plead materiality. *Vigil*, 639 F.3d at 798–800. "Merely alleging *why* the Certifications were false is insufficient" to satisfy Rule 9(b); instead, the court required the complaint to allege "why these alleged regulatory violations were material to the government" and to connect "the alleged false statements to the government's decision to pay false claims." *Id.* at 799–800; *see also Grabcheski*, 687 F. App'x at 87 (holding that the plaintiff "failed to allege with particularity facts that demonstrate how th[e] difference in value . . . was likely to have had any effect on the Agreements" with the government).

A product-safety case from California also provides excellent guidance into what the particularity rule requires in this context. *Arroyo v. Chattem, Inc.*, 926 F. Supp. 2d 1070, 1078–80 (N.D. Cal. 2012). In *Arroyo*, the plaintiff alleged that a pharmaceutical company committed fraud by promoting a weight-loss supplement as "safe," while failing to disclose the existence of a chemical (hexavalent chromium) in the product. *Id.* at 1073. The court noted that the labels did not affirmatively state that the product was hexavalent-chromium free, and therefore that "Plaintiff must specifically allege that hexavalent chromium at the level present in [the product] makes statements about the product's safety false or misleading." *Id.* at 1079. The plaintiff relied on general statements that "hexavalent chromium is unsafe" to plead materiality. *Id.*

The district court dismissed the claim, holding that the materiality allegations in the complaint did not satisfy Rule 9(b). *Id.* at 1078–79. In doing so, the district court reasoned:

> Many foods and drugs on the market are not one hundred percent safe, and general allegations that a product's safety is less than one hundred percent do not give rise to a lawsuit for fraud . . . Under this theory of materiality . . . Plaintiff's FAC is insufficient because it does not allege a level of hexavalent chromium [in the product] that materially changes its safety profile from safe to unsafe.

*Id.* at 1079. This theory provides a helpful framework for evaluating materiality. In a silent-fraud case where violations occur by degree, the plaintiff must allege, with particularity, the point at which the defendants crossed from innocuous mistakes to fraudulent omissions. In a product-safety case like *Arroyo*, that means the plaintiff must plead the scientific threshold for safe levels of the offending chemical. Here, Prather has a similar task.

**3**

In *Prather I*, we held that a late certification is false if "the length of the delay is [not] justified by the reasons the home-health agency provides for it." *Prather I*, 838 F.3d at 765. This general standard leaves crucial issues unresolved. At what point does a late signature require an explanation? It depends. When an explanation is required, how detailed must the explanation be? It depends. What kind of justifications suffice? Again, it depends: In *Prather I*, the majority refused to answer these questions, suggesting instead that each case must rise and fall on its own facts, and even noting that "the rare excuse . . . could justify a delay" beyond the 60-day episode of care, despite the fact that the government has said such delays are "not acceptable." *Id.* at 765 n.6.

It follows that Prather (or any other relator) must plead facts connecting the defendant's insufficient justifications to Medicare's decision to pay. She must explain to us (and to Brookdale) why and how the government would have been deceived by the failure to include the explanations omitted here. Put another way, she must pinpoint the limits of the government's patience, as applied to her allegations. Even assuming that the delay was "due only to the fact that Brookdale had accumulated a large backlog of Medicare claims," *id.* at 765, Prather must allege facts showing that this excuse is either unacceptable to the government in all cases, or that the government would not have accepted it under the circumstances of this case. Otherwise, we

have no basis for finding (a) that the government wanted Brookdale to disclose this delay and explain it at the billing stage, and (b) that if had Brookdale done so, then the government probably would have denied reimbursement.

This might seem like an unduly harsh requirement. But it is essential if Rule 9 is to serve the notice-providing function Congress ascribed to it. Particularly when the regulation offers a vague threshold ("as soon thereafter as possible") and where we have made it even more vague by interpretation, a silent-fraud plaintiff *must* be able to explain, with particularity, if and how the specific violation would have influenced the government's payment decision. Otherwise, Brookdale is left to guess about how it has allegedly defrauded the government.

**C**

How can Prather—or any other relator—meet this threshold? *Escobar* made it clear that the world is Prather's oyster: No "single fact or occurrence [i]s always determinative" in deciding whether something is material. *Escobar*, 136 S. Ct. at 2001. Instead, the Court subscribes to an approach that treats everything as relevant, so long as it sheds light on the government's behavior, rather than its abstract legal rights. *Id.* at 2001–03 (observing that the relevant barometer of influence is "the effect on the likely or actual behavior of the recipient," not merely whether "the Government would have the option to decline to pay"). Relevant facts include the government's payment history, the way the government characterizes the requirement, and whether the omission goes to the essence of the bargain. *Id.* at 2001–04. Prather may use any combination of these facts (and others) to demonstrate that Brookdale's excuses are unacceptable to the government in all cases, or that the government would not have accepted the excuses due to the larger delays present in this case. She has not accomplished this.

**1**

The government's payment habits are, by far, the best evidence of materiality. If the government "refuses to pay claims in the mine run of cases based on noncompliance" with a particular rule, then the requirement is almost certainly material. *Id.* at 2003. In contrast, if the government "regularly pays a particular type of claim in full despite actual knowledge" of the violations, then Prather would be hard-pressed to demonstrate materiality. *Id.* at 2003–04.

Unfortunately, neither Prather nor Brookdale offer this information. Instead, each argues that the other's silence on the subject is evidence that the government cares (or doesn't care) about the information. This does not hurt Brookdale, who bears no legal burden in this context. Neither does it (technically) hurt Prather, except to say that it moves her no closer to the goal. *See id.* at 2000–02 (suggesting that a plaintiff need not present payment statistics to survive a motion to dismiss). Although we granted the United States' motion to appear as an amicus at oral argument, counsel refused to say whether or not she knew of the government's payment habits. Perhaps discovery will dredge up helpful information about the payment policies of Brookdale's MAC; perhaps it won't. The answer to that question will weigh heavily on Prather's case at the summary-judgment stage. The Court has, however, indicated that we cannot deny a motion to dismiss simply because discovery might help flesh out a plaintiff's claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 684–86 (2009).

So we are no closer to answering the materiality question than we were before. An inquiry into the government's payment habits has placed no facts on the scale. Again, this does not technically hurt Prather; it has just removed one of her weapons. In other words, Prather need not present us with this information now, but she still needs to present *something* to satisfy Rule 9(b).

**2**

I agree that we have made the timing-and-explanation requirement a condition of payment. However, this only means that the government would have the option to decline payment if it knew that the requirement had been violated. *Escobar* requires that we look beyond this bare fact and ask about the importance of the requirement under the circumstances of this case. *Escobar*, 136 S. Ct. at 2003. To do so, we must naturally examine what the government has said about it, and the way a provider might disclose a violation to the government. Prather can draw little solace from this information—indeed, a thorough examination shows that it hurts her case.

Medicare prescribes the method by which providers submit claims for reimbursement. *See* 42 U.S.C. §§ 1302, 1395hh; 42 C.F.R. § 424.32. Providers must use the forms indicated by

the regulations. 42 C.F.R. § 424.32(a)–(b). Home health service providers primarily use Form CMS-1450 (Uniform Institutional Provider Bill) and sometimes use CMS-1500 (Health Insurance Claim Form). *Id.* § 424.32(b); Medicare Claims Processing Manual, Ch. 10, §§ 10.A, 40. This data usually must be submitted electronically, but both the paper and electronic claims forms contain substantially the same information. *See id.*; 42 C.F.R. § 424.32(d)(2).

The CMS-1450 has 81 fields. Most are for boilerplate information about the patient, the provider, and the services provided. *See* Medicare Claims Processing Manual, Ch. 25, § 75. The form also contains fields for the date of admission, start of care, and statement period. *See id.*, Ch. 10, § 40.1; *id.*, Ch. 25, § 75.1; CMS-1450, FL 6, 12–15. For HHA claims, the "statement period" field is the sixty-day episode of care mandated by the Prospective Payment System. Medicare Claims Processing Manual, Ch. 10, §§ 40.1–40.2.

The form also contains a blank, lined field titled "Remarks." *See* CMS-1450, FL 80. The general instructions for completing the form indicate that this field should be used to enter "any remarks needed to provide information that is not shown elsewhere on the bill but which is necessary for proper payment." Medicare Claims Processing Manual, Ch. 25, § 75.6, FL 80. The specific guidance for HHA claims state that this field is "[c]onditional," *id.*, Ch. 10, § 40.1–40.2, meaning that it is a field "that must be completed if other conditions exist," *id.*, Ch. 1, § 70.2.3.1. For a final bill, remarks are "required only in cases where the claim is cancelled or adjusted." *Id.*, Ch. 10, § 40.2.

The rear of the form lists multiple typewritten warranties, all of which are adopted (if applicable) by the provider when it submits the form. The general warranty affirms that "the billing information as shown on the face hereof is true, accurate and complete," and that "the submitter did not knowingly or recklessly disregard or conceal material facts." *See* CMS-1450, Gen. Warranty. Among the specific warranties is a verification that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file" with the provider. *See id.*, Spec. Warranty No. 3. Two observations can be drawn from this data.

First, nothing in the forms, regulations, or guidance suggests that the government cares to review the certifications during the billing process. The general warranty only refers to the

accuracy and completeness of the data "shown on the face hereof." *See id.*, Gen. Warranty. It does not require a provider to aver that it has fastidious recordkeeping policies. At most, the regulations require HHAs to keep the forms "on file" and provide the certifications and other medical records "upon request." *Id.*, Spec. Warranty No. 3; 42 C.F.R. § 424.22(c). It appears that production is only necessary if the MAC initiates a medical review because it suspects improper payment. *See* Medicare Program Integrity Manual, Ch. 3, §§ 3.2.1, 3.2.3.A, 3.3.1.1; *id.*, Ch. 6, §§ 6.1–6.3. Indeed, the physicians need not actually use the CMS-485 (certification template) to certify patient need, "as long as a physician certifies that the five certification requirements" are satisfied. *Id.*, Ch. 6, § 6.2.1.

Second, the form does not contemplate that a provider would disclose a late certification at the billing stage. Neither does it request the date of the physician certification so that billing officials can compare it to the episode of care and evaluate lateness issues. The only place where they might do so on the face of the form would be in the remarks section. But the form instructions identify only two limited circumstances where a provider should complete this field before submitting a bill: "only in cases where the claim is cancelled or adjusted." Medicare Claims Processing Manual, Ch. 10, § 40.2. Thus, by Medicare's own definitions, a bill submitted without a late-signature disclosure would still be "complete," because it would not omit any required information. *Id.*, Ch. 1, § 70.2.3.1. Although this is not dispositive, it fails to provide any support for Prather's assertion that the omissions are material.

Prather's theory fares no better in light of the Medicare Guidance. Medicare's *Program Integrity Manual* devotes nearly 100 pages to instructing Medicare Administrative Coordinators ("MACs") on how to identify "potential errors" and take "corrective actions." *See generally* Medicare Program Integrity Manual, Ch. 3. The mine run of claims submitted to Medicare only include the bill, not the underlying medical records. *See id.*, § 3.3.1.1. Thus, records are only submitted to the MAC if it initiates a medical review to ensure that the services provided were medically necessary. *See id.*, §§ 3.2.1, 3.3.1.1; *id.*, Ch. 7, § 7.2. Although a MAC has the authority to demand records and "review any claim at any time," the sheer size of Medicare "doesn't allow for review of every claim." *See id.*, Ch. 3, §§ 3.2.1, 3.2.3.A; *see also* 42 C.F.R. § 424.22(c).

Consequently, this guidance commands the MACs to prioritize their review efforts. In doing so, they must focus on "areas with the greatest potential for improper payment," or "where the services billed have significant potential to be non-covered or incorrectly coded." Medicare Program Integrity Manual, Ch. 3, § 3.2.1. The guidance lists five red flags that the MACs may use to set priorities.[2] *Id.* Nowhere in this guidance or any of the regulations does the government even hint that any late signatures are so important to a MAC's auditing or payment decisions that a provider would be expected to disclose them every time.

Prather directs us to two pieces of information suggesting that *some* late signatures might be material. Reports from the HHS Inspector General addressing home-health service compliance indicate that a special area of concern to the agency was "[u]ntimely and/or forged physician certifications on plans of care." *Compliance Program Guidance for Home Health Agencies*, HHS Office of Inspector General, 63 Fed. Reg. No. 152, 42410, 42414 (Aug. 7, 1998). Such statements count as one of the red flags that a MAC may use to set its auditing priorities. Medicare Program Integrity Manual, Ch. 3, § 3.2.1. Related guidance, addressed to the HHAs (rather than the MACs) states that "[i]t is not acceptable for HHAs to wait until the end of a 60-day episode of care to obtain a completed certification/recertification." Medicare Benefit Policy Manual, Ch. 7, § 30.5.1 (2015).[3]

Taken as a whole, the guidance and the forms undercut Prather's case. In the first place, they provide no support for Prather's (conclusory) allegation that the government would not have

---

[2]These flags include (1) a high volume of services, (2) high cost of services, (3) a dramatic change in frequency, (4) high risk and problem-prone areas, and (5) data from OIG and other agencies indicating vulnerability. MEDICARE PROGRAM INTEGRITY MANUAL, Ch. 3, § 3.2.1.

[3]Prather identifies two other pieces of guidance that are only minimally persuasive. First, she points to a policy factsheet from another MAC, which states that no payment will be made if the certification is not obtained prior to the care being given. R. 98, Third Amended Compl., ¶ 50, PID 1472. Although this somewhat relevant, it has little bearing on what *Brookdale*'s MAC requires, which is the real question here. Prather does not provide similar information from Palmetto GBA, which processes claims for Brookdale. *Id.*, ¶ 57, PID 1474. Second, Prather identifies a CMS outreach pamphlet, stating that a HHA "may not add late signatures to medical records (beyond the short delay that occurs during the transcription process)." *Id.*, ¶ 52, PID 1473. However, she neglects to mention that the same guidance, in the very next sentence, states: "If the practitioner's signature is missing from the medical record, submit an attestation statement from the author of the medical record." *Complying with Medicare Signature Requirements*, CENTERS FOR MEDICARE AND MEDICAID SERVS., at 2 (March 2016). Elsewhere in her complaint, Prather appears to acknowledge that this "attestation method" was exactly how Brookdale obtained the late signatures. *See* R. 98, Third Amended Compl., ¶ 86, PID 1481.

paid Brookdale's claims had they known about the late certifications. In other words, Prather has not pointed us to *any* governmental statements disapproving of Brookdale's alleged excuses, either as a per se matter or in the context of these particular delays. Neither has she used any of this information to explain how and why the government was misled by Brookdale's alleged omissions. Indeed, the forms and the guidance are completely silent about what excuses suffice to justify delays of this magnitude.

Second, the regulatory framework suggests that the government is not interested in the timing-and-explanation issue during the billing stage. The sheer size of the Medicare program requires a streamlined approach to billing review. To serve this purpose, CMS created a uniform billing form that applies to most claims—a single page containing all the information necessary to process and pay the claim. 42 C.F.R. § 424.32(b); Medicare Claims Processing Manual, Ch. 10, §§ 10.A, 40. The form is not designed to accommodate the explanations contemplated by *Prather I*. The "remarks" field—the only conceivable place to offer such a justification—is tiny and ill-suited to accommodate the complete explanations necessary to avoid more accusations of silent fraud.

Instead, the timing-and-explanation requirement is probably enforced by auditing. No one disputes that the government might initiate an audit of Brookdale's files and decide that it had not satisfied the certification requirements. In this context, Brookdale could offer the kind of detailed, patient-specific explanations for lateness that we required in *Prather I*. Under *Prather I*, a MAC might well be dissatisfied with those reasons and demand reimbursement. At the billing stage, however, it seems that the billing agents only look at the face of the form to ask whether "the services billed have significant potential to be non-covered or incorrectly coded." Medicare Program Integrity Manual, Ch. 3, § 3.2.1. At a higher level, the MACs also use sophisticated algorithms and pattern-matching (e.g., unnatural spikes in volume, high-cost services) to identify potential areas for audits. *See id.* Although this is not dispositive, it does give us some insight into what the government is looking for at the billing stage—and if the government is not looking for the information that Brookdale omitted, then such information is probably not material.

Ultimately, this is another dead end for Prather. If the timing of the signatures was truly a fulcrum of the government's payment decisions, one would expect to find some reference to it in the instructions that CMS gives to the companies who make those judgments. Again, this is not fatal to Prather's case—it simply removes another arrow from her quiver. Without concrete evidence of the government's payment history or any helpful regulatory guidance, Prather must present some other particular information showing how and why these omissions deceived the government. *See Escobar*, 136 S. Ct. at 2001–03.

**3**

The government need not specify every single detail of a transaction in order to protect itself from silent fraud. *Id.* at 2001–02. Some things go without saying. The government is entitled to presume that the guns it orders "must actually shoot," even if it does not expressly require that function. *Id.* Such omissions go to the very essence of the bargain and are usually material. *Id.* at 2001–03 & n.5. Prather and the majority conclude that Brookdale's failure to disclose an adequate justification goes to the very essence of the bargain; therefore, Prather can proceed even though she has not otherwise satisfied the particularity requirement.

The case law refutes this position. Start with *Escobar*. The defendants in *Escobar* provided mental health services to children and billed Medicaid for those services. *Id.* at 2000. However, they failed to disclose that their social workers did not have the training or credentials expressly required by the regulations. *Id.* This omission went to the essence of the bargain—the defendants did not (and could not) perform the mental-health services for which they were paid. Another leading case cited by the majority involved similar facts—a mortgage lending executive who certified that he was eligible for a FHA-sponsored loan problem without revealing that he had been indicted for wire fraud and obstruction of justice. *United States v. Luce*, 873 F.3d 999, 1001–03 (7th Cir. 2017). One might compare these cases to a person who bills the government for public-defender services without mentioning that he has never been licensed to practice law (*Escobar*) or that he is in imminent danger of disbarment (*Luce*).

History also provides colorful examples. The FCA was enacted during the Civil War to combat fraud (including silent fraud) in defense contracts. *See United States ex rel. Spay v. CVS*

*Caremark Corp.*, 875 F.3d 746, 753 (3d Cir. 2017).  Among the culprits in those cases were contractors who sold "artillery shells filled with sawdust instead of explosives," and uniforms "made of shredded, often decaying rags, pressed . . . into a semblance of cloth that would fall apart in the first rain."  *Id.* (internal citations and quotation marks).

Prather's claims, as currently pled, are not in the same universe.  Medicare was established to "provide[] basic protection against the costs of . . . home health services" for the elderly.  42 U.S.C. §§ 1395c, 1395j.  The enforcing regulations for home-health services require physician certifications to ensure that Medicare does not pay for those services when they are not necessary, in order to preserve the financial integrity of the program for those who truly need it.  *See* 42 C.F.R. § 424.22.  The regulations accordingly require the certifications to be done by a person with one of five specific levels of training.  *See id.* § 424.22(a)(1)(v)(A).  Had Prather alleged that the forms were signed by individuals not covered by the regulation, her case would be squarely covered by *Escobar*, and Brookdale would have deprived the government of the essence of its bargain.  That is not the case here—Prather's only theory of relief is that the forms were signed too late and that the lateness was unjustified, not that the caretakers were inherently unqualified or that the care was fundamentally defective.

The majority claims that these omissions are crucial because the timing-and-explanation requirement is an antifraud measure.  This argument is a non-starter.  Of course the regulations are designed to prevent fraud.  Most (if not all) Medicare regulations exist to make sure the government gets what it paid for.  But *Escobar* made it clear that only *significant* regulatory violations can be the basis for silent-fraud liability.  *Escobar*, 136 S. Ct. at 2003–04.  Thus, anti-fraud rhetoric set aside, all Prather can derive from this theory is the bare assertion that Brookdale violated § 424.22.  This does not satisfy *Escobar*.  Prather still has not offered an explanation for how and why Brookdale's omissions actually deceived the government.

Perhaps the closest she comes to this goal is by pointing to the sixty-day period mentioned in the 2015 guidance revisions.  That guidance states that "[i]t is not acceptable for HHAs to wait until the end of a 60-day episode of care to obtain a completed certification/recertification." Medicare Benefit Policy Manual, Ch. 7, § 30.5.1 (2015).  Although this language was added after the conduct at issue here, Prather claims that this is longstanding

policy that goes to the essence of the government's bargain. *See Prather I*, 838 F.3d at 765 n.6. This argument fails on two fronts. First, *Prather I* expressly refused to say that such lateness was categorically inexcusable, even while concluding that it was unjustified here. *Id.* at 765 n.6. If this is true, then it is hard to see how this kind of a violation is so egregious that it always goes to the very essence of the bargain.

Second, and in a related vein, the argument does nothing to explain why *this* delay is material. If a lengthy delay can be justified in some circumstances, Prather must show us why this is not one of those cases. The only excuse she identifies is a massive paperwork backlog. But she makes no compelling argument that disclosure of this excuse would have caused some adverse reaction from the government. Of all the problems faced by Medicare's antifraud contractors, "Paperwork backlog" is not Public Enemy No. 1, or anywhere close to it. Perhaps there is no excuse for Brookdale's conduct here. But my point is that Prather has utterly failed to explain *why* this is the case. Rule 9(b) expects more from someone making accusations of fraud under a statute that is inherently punitive. *See Vigil*, 639 F.3d at 798–80 ("The Complaint fails to allege with particularity . . . why these alleged regulatory violations were material to the government's decision to pay. . . ."); *Hopper*, 588 F.3d at 1330 (holding a complaint deficient when it "d[id] not link the alleged false statements to the government's decision to pay false claims.").

**4**

At the end of the day, Prather is left with an empty quiver. Though none of the factors discussed above are dispositive, Prather can only claim victory in half of one analysis (she correctly identifies the requirement as a condition of payment). This is not enough to demonstrate materiality. Accordingly, I would affirm the district court.

To some extent, the deficiency in Prather's complaint is not her fault. To show materiality, the plaintiff must make some showing that the omission would influence the government. Since past behavior and administrative guidance is the best predictor of future conduct, a plaintiff can typically mine the agency's publications and industry experience for guidance on what is material. But the timing-and-explanation requirement does not appear in

any regulation. It does not come from any agency guidance, adjudication, or notice-and-comment process. It has no history in the Medicare billing system. It sprung, fully formed, from the minds of two federal judges. Consequently, Prather has no history, commentary, or guidance she can use to demonstrate materiality.

Judicial legislation always has pernicious consequences, and this case is no different. By inventing a rule out of whole cloth to preserve this case at the falsity stage, the *Prather I* majority failed to realize it was also crippling the plaintiff's case on materiality grounds. Today, rather than confessing its first error, the majority compounds it by twisting the law of materiality to cover up the mistakes it made two years ago. It would not surprise me if this case returns to us in a few years, presenting us again with a third opportunity to correct ourselves or warp the law even further. The lesson, then, is clear: Leave rulemaking to the legislators and administrators, even when the present outcome appears unjust. The orderly development of the law is not without rough patches, but it is better than living under the law of unintended consequences.

## III

The majority also addresses the scienter requirement of the statute, although the district judge did not. And again, the majority gets it wrong.

Like with all fraud claims, the FCA imposes a "rigorous" scienter requirement. *Escobar*, 136 S. Ct. at 2002. Even if a defendant's claim suffers from a material omission, fraud liability does not attach unless the defendant *knows* that the requirement is material to the government's payment decision. *Id.* at 1996. The majority admits as much. Maj. Op. at 18. A defendant acts knowingly if it "has actual knowledge of the information," "acts in deliberate indifference of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Finally, although Rule 9 does not apply to alleging a person's state of mind, this "does not give [the plaintiff] license to evade the less rigid—though still operative—strictures of Rule 8." *Ashcroft v. Iqbal*, 556 U.S. 662, 686–87 (2009).

Thus, Prather still faces a tough standard. She must allege facts plausibly showing that Brookdale knew omitting the explanations would influence the government's payment decisions

or that it recklessly disregarded that possibility.  The majority claims she has pled recklessness.  She has not.

The first problem with the majority's argument is that the allegedly wrongful conduct occurred between 2011 and 2012.  The timing-and-explanation requirement did not exist until we decided *Prather I* in 2016.  True, the regulation states that the certifications must be obtained "at the time the plan of care is established or as soon thereafter as possible."  42 C.F.R. § 424.22(a)(2).  But before *Prather I*, no one had any reason to think that this regulation required HHAs to submit explanations for all late signatures, or that a delay is "acceptable only if the length of the delay is justified by the reasons the home-health agency provides for it."  *Prather I*, 838 F.3d at 765.  I struggle to see how Brookdale can be held responsible for recklessly disregarding such a specific requirement when nothing—absolutely nothing—in the existing law required it to provide affirmative justifications for late signatures during the billing process.

The second problem is that most of Prather's scienter allegations have no relationship to the signatures.  Though the nurses were instructed to review claims "only cursorily," Maj. Op. at 19, Prather concedes that they *were* told to "make sure the orders are signed, the face to face documentation is complete, and the therapy reassessments are present in the charts," R. 98, Third Amended Compl., ¶¶ 87, 91, PID 1481–82.  So even while they were allegedly instructed to ignore other compliance issues, they were expressly told not to ignore the signature requirements. *Id.*  I fail to see how this is evidence of reckless disregard as to the timing-and-explanation theory on which Prather relies.

The same symptoms infect Prather's other scienter allegations.  Prather alleges that management ignored her complaints about noncompliance in the forms.  Maj. Op. at 19 (citing R. 98, Third Amended Compl., ¶¶ 91–92, PID 1482).  But these paragraphs reveal that Brookdale only ignored her complaints about general flaws in the underlying medical records, not missing signatures—indeed, she was told specifically, and on several occasions, to scour the documents for missing signatures so the errors could be corrected.  R. 98, Third Amended Compl., ¶¶ 91–93, PID 1482–83.  The majority also cites an email where management said "not all physicians would be 'comfortable' with signing" the late certifications.  Maj. Op. at 19.  But again, this is not the whole picture: In the same breath, the emails acknowledge that "we can not

force this process," suggesting that Brookdale was trying to speed up the process as much as they could without resorting to the kind of unsavory methods indicative of fraud. R. 98, Third Amended Compl., ¶¶ 98, PID 1483–84.

The closest Prather comes to alleging scienter is in paragraphs 99 and 100. There, she alleges that Medicare would frequently cancel Brookdale's RAPs because the final bill was not submitted in time, but then Brookdale would immediately re-bill the RAP without having the physician signatures on file. *Id.*, ¶¶ 99–100, PID 1484–85. Prather's supervisors admitted in an email that this practice might "trigger a probe or review by Medicare." *Id.*, ¶ 100, PID 1485. Thus, at least superficially, this suggests that Brookdale knew some of its billing practices might draw the ire of Medicare auditors.

But again, these allegations fail because they are not connected to Prather's theory of relief: That Brookdale acted with reckless disregard for the materiality of the late signatures and omitted explanations. As explained earlier, a provider may bill a RAP—but not a final claim— without the physician signatures on file. *See supra*, at 23. Although this could be done with a nefarious or reckless motive, it is equally plausible that Brookdale was simply keeping the window open while it collected the signatures and explanations that the regulation requires. Nothing in this behavior inherently suggests that Brookdale was rebilling these claims with the intent to submit final bills that omitted material information. Since Prather has alleged facts that are, at best, only consistent with recklessness, she has not satisfied the requirements of Rule 8. *Iqbal*, 556 U.S. at 678.

## IV

My dissent today should not be understood as endorsing Brookdale's conduct. Medicare providers can and should be much more careful and meticulous with their recordkeeping. But accusing someone of fraud is a serious thing, and I simply am not convinced that Prather has alleged anything more than sloppy management and negligence. Medicare has a myriad of tools to prevent and remedy the problems associated with these lesser forms of culpability, but no one contends that this power has also been delegated to relators. If Congress wants to permit relators

to pursue negligence claims on behalf of the government, so be it.  But we lack the authority to make that policy judgment by equating negligence with fraud.

For the reasons stated above, I respectfully dissent from the opinion of the court.